639 So.2d 652 (1994)
Gladys GARDNER, as Personal Representative of the Estate of Roosevelt Gardner, Appellant,
v.
Edward W. HOLIFIELD, M.D., Appellee.
No. 93-746.
District Court of Appeal of Florida, First District.
July 5, 1994.
*653 Robert L. Hinkle and David P. Healy of Aurell, Radey, Hinkle, Thomas & Beranek and Tari Rossitto-Van Winkle, Tallahassee, for appellant.
Gary A. Shipman and C. Timothy Gray of Collins & Truett, Tallahassee, for appellee.
KAHN, Judge.
This is a medical malpractice action brought by Gladys Gardner, Roosevelt Gardner's surviving mother and the personal representative of his estate, against Edward W. Holifield, a Tallahassee physician. Mrs. Gardner alleges that one or more acts of negligence committed by Dr. Holifield in his capacity as a private physician contributed to Roosevelt Gardner's death from Marfan's Syndrome at the age of eighteen. Acting upon Dr. Holifield's motion, the trial court entered summary judgment in favor of Dr. Holifield and against Gardner. Because we agree with Mrs. Gardner that the trial judge erroneously resolved disputed issues of fact against her as the nonmoving party, we reverse and do not reach Gardner's remaining issue.
Roosevelt Gardner entered Florida A & M University (FAMU) in the fall of 1988 on a basketball scholarship. On September 6th of that year, Roosevelt went to the FAMU clinic for a basketball physical. Dr. Holifield, employed at that time as the medical director of FAMU Student Health Center, performed the physical examination. Dr. Holifield diagnosed Roosevelt as possibly suffering from Marfan's Syndrome, a potentially lethal connective tissue disorder often characterized by cardiovascular irregularities. Dorland's Illustrated Medical Dictionary, 1294 (26th Ed.). In order to confirm the diagnosis, Dr. Holifield referred Roosevelt to radiologists for chest x-rays and to an ophthalmologist to check for an eye condition that frequently accompanies Marfan's. Dr. Holifield ordered two echocardiograms, the first performed on September 6, 1988, and the second performed on September 22, 1988. The echocardiograms were done at Tallahassee Memorial Regional Medical Center (TMRMC). Dr. Holifield read the echocardiogram tapes, issued interpretive reports on TMRMC letterhead, and received compensation personally through a services contract with TMRMC. Six months after being initially seen by Dr. Holifield, 18-year-old Roosevelt Gardner collapsed at a service station and died.
In her suit, Mrs. Gardner alleges that Dr. Holifield failed to properly identify the extent of Roosevelt's illness or to implement an appropriate course of treatment. Mrs. Gardner supports the specific allegations of negligence by affidavits submitted by medical experts. These affidavits corroborate Mrs. Gardner's contentions that Dr. Holifield failed to advise Roosevelt of the gravity of his condition, the attendant risks, and need for prompt medical treatment and surgical evaluation. Gardner's experts further contend that Dr. Holifield improperly allowed Roosevelt to continue with weight training *654 and other activities inappropriate to his physical condition.
Mrs. Gardner initially brought this wrongful death action against Dr. Holifield, individually, in his capacity as a private physician treating Roosevelt, and against FAMU, where Dr. Holifield served as Director of Student Health Services. FAMU sought summary judgment and advanced the position that any actions taken by Dr. Holifield "following the diagnosis of a potential heart problem and advising Gardner of same ... were not done in his capacity as Director of Florida A & M Student Health Services." FAMU filed the affidavit of Dr. Richard Flamer, Vice President for Student Affairs, dated April 3, 1992. Dr. Flamer stated under oath: 1) the FAMU Health Center was not properly equipped nor intended to diagnose or treat any serious injury or medical condition, such as Marfan's Syndrome; 2) Dr. Holifield's sole responsibility "within his position at the Health Center" was to refer Roosevelt Gardner to an appropriate medical specialist outside of the university, to advise Roosevelt Gardner of the confirmed diagnosis of Marfan's Syndrome, and to inform the FAMU athletic department that Roosevelt had not been medically cleared to participate in basketball. Dr. Flamer stated further, still under oath, "any additional diagnostic or evaluative cardiology services for Mr. Gardner outside the University Health Center, or any other medical services which were beyond the designated capabilities of the Health Center ... were outside the scope of Dr. Holifield's employment as Medical Director of the University Health Center."
Dr. Holifield filed his own motion for summary judgment, supported by his sworn affidavit, and contended: 1) Dr. Holifield had never seen Roosevelt Gardner in private practice; 2) Dr. Holifield's sole physician/patient relationship with Roosevelt Gardner was for the purpose of performing an athletic physical as Director of the University Student Health Center; and 3) all evaluations and examinations of Mr. Gardner were done in Dr. Holifield's capacity as Medical Director. The trial judge, specifically referencing Dr. Flamer's April 3, 1992 affidavit, denied Dr. Holifield's motion for summary judgment on the issue of scope of employment. Mrs. Gardner then settled her case against FAMU and proceeded solely against Dr. Holifield individually.
After the settlement, Dr. Holifield renewed his motion for summary judgment. In support of this motion, Dr. Holifield obtained a new affidavit from Dr. Flamer. Flamer executed the second affidavit on September 2, 1992, approximately five months after his initial affidavit tendered in support of FAMU's motion for summary judgment, and four years after the time Dr. Holifield saw Roosevelt Gardner as a patient. In this sworn document, Flamer indicated, "Since executing an affidavit dated April 3, 1992, I have had the opportunity to review the Florida A & M University Student Health Center records on Roosevelt Gardner, the complaint against Dr. Holifield, and the transcript of the deposition of Dr. Holifield." Dr. Flamer then, without mention of his April 3, 1992 conclusions, stated:
1) It is my belief that all the activities performed by Dr. Holifield in this case with the exception of reading the echocardiogram at Tallahassee Memorial Regional Medical Center, fell under the course and scope of his duties as Director of Florida A & M University Health Center;
2) Dr. Holifield's activities in his position as Director of the Student Health Center would have included the examination of Mr. Gardner, referral of Mr. Gardner for outside studies, such as the chest film, echocardiogram and eye examination, [and] informing Mr. Gardner of the results of any studies and physical exams; and
3) It is my affirmative belief that every accusation against Dr. Holifield alleged in the complaint falls under the course, scope and duties as the Director of the Student Health Center at Florida A & M University.
Opposing the motion, Mrs. Gardner referenced the affidavits she obtained from her experts, Dr. Reid Pyeritz, Dr. Barry Maron and Dr. Allan March. Mrs. Gardner also relied upon deposition testimony presented by Philip Horton, the athletic trainer at FAMU, and the original affidavit of Dr. Richard Flamer. The sole issue raised by Dr. *655 Holifield's motion concerned whether any of the acts of medical negligence alleged by Mrs. Gardner occurred in Dr. Holifield's capacity as a private physician. Dr. Holifield, of course, took the position that the undisputed facts of record could only support a conclusion that he did nothing beyond his capacity as an employee of FAMU, and since Mrs. Gardner had already settled with FAMU, he was entitled to summary judgment in his individual capacity. After a two-hour motion hearing, the court granted summary judgment in favor of Dr. Holifield. This appeal follows.
On appeal, Mrs. Gardner claims that the record is in factual conflict as to whether Dr. Holifield acted at least partly as a private cardiologist when he treated Roosevelt Gardner for Marfan's Syndrome. She specifically notes several matters of record which she believes were overlooked by the trial court. These matters can be briefly summarized. The FAMU clinic, by the terms of its own Operational Manual, provides only routine services[1] and does not treat serious illnesses. Accordingly, Mrs. Gardner infers that Dr. Holifield was acting beyond the scope of the clinic's function in his duties as director when he followed up with Roosevelt after the initial diagnosis of Marfan's Syndrome, a condition not characterized as minor. The clinic's Operational Manual states, "If specialized care is indicated, the student will be referred to a local physician. The student is responsible for his own bill." Dr. Holifield referred Roosevelt to an ophthalmologist and radiologist, but made no referral to a cardiologist. Noting that Dr. Holifield holds himself out as a cardiologist, Mrs. Gardner suggests that Dr. Holifield was to function as the heart specialist.[2]
Dr. Holifield ordered and interpreted two diagnostic echocardiograms. He prepared his reports on TMRMC letterhead and received direct compensation for reading the echocardiograms. Mrs. Gardner now argues that misinterpretation of these echocardiograms was part and parcel of the medical negligence she attributes to Dr. Holifield.
As noted earlier, Dr. Richard Flamer submitted two affidavits before the trial court. The first came in support of FAMU's motion for summary judgment and was directed at defeating Mrs. Gardner's contention that FAMU should be responsible for any negligence of Dr. Holifield, since Dr. Holifield was, at least in part, acting in the course of his employment with FAMU. After FAMU settled with Mrs. Gardner, Dr. Flamer filed his second affidavit, this time in support of Dr. Holifield's position that any and all of his actions in the diagnosis and treatment of Roosevelt Gardner were taken as an employee of FAMU.
Mrs. Gardner also notes the deposition testimony of FAMU basketball trainer Phil Horton. She relies specifically upon the following passage from Horton's deposition:
Q Why was Dr. Holifield viewed as the fall-back physician?
A Because we felt that we could go with  we felt that we could appeal to him if we had no one else.
Q Did that have anything  the fact that you could appeal to him, did that have anything to do with his employment with Florida A & M University?
[Objection omitted]
A No....
Q Was the reason Dr. Holifield was doing the physicals on the basketball players in the 1988-1989 school year because he was the director of the FAMU student health service and was a physician at Florida A & M University?
[Objection omitted]
THE WITNESS: No.
Q Why was he seeing these students?

*656 A Because he was  well, I thought I answered. He was seeing the students. He was seeing them just as any other doctor would as a consultant. It wasn't an official thing for him to do the Athletic Department's physicals.

[emphasis supplied in appellant's initial brief]
Mrs. Gardner acknowledges that Horton testified later in the same deposition, in response to questions asked by Dr. Holifield's attorney, that Dr. Holifield did not act as a private cardiologist in seeing Roosevelt and other FAMU basketball players. She argues, however, that for purposes of summary judgment, the inconsistency in the deposition testimony must be resolved against Dr. Holifield.
Finally, Mrs. Gardner points to the affidavits prepared by her own experts, beginning with Dr. Pyeritz, professor of medicine and pediatrics at Johns Hopkins School of Medicine. Dr. Pyeritz reviewed the records of FAMU and TMRMC, and read the echocardiogram reports. In his opinion, had Dr. Holifield provided appropriate treatment and taken proper steps after confirming the diagnosis, Roosevelt would have survived with an excellent prognosis for normal life expectancy.
Dr. Maron, a cardiologist employed by the National Institute of Health also reviewed Roosevelt's medical records. He then provided expert opinion testimony that Dr. Holifield did not undertake appropriate follow-up care of Roosevelt Gardner after Dr. Holifield made the initial diagnosis of Marfan's Syndrome. Dr. Maron specifically noted the incorrect and inaccurate reading of the echocardiograms done at TMRMC. Maron concluded that as a result of this improper interpretation, Dr. Holifield failed to comprehend and appreciate the need for immediate surgical consultation and the probable need for cardiovascular surgery. Maron went on to note the reasonable obligations accruing to a cardiologist upon diagnosing a patient with Marfan's Syndrome.
Expert Dr. Allan March came with a somewhat different background, in that he had been employed for several years as the director of a university health center at the University of Arkansas. Based upon his experience as a university health director, his review of Dr. Holifield's job description at FAMU and his review of FAMU's Student Health Operations Manual, Dr. March provided opinions concerning the probable demarcation between medical care provided by FAMU Student Health Services and such care provided by Dr. Holifield in his capacity as a private physician.
State employees, including medical doctors, enjoy immunity from liability for negligence committed within the scope and course of their state employment. § 768.28(9)(a), Fla. Stat.[3] Sovereign immunity does not, however, protect state employees from liability for negligent acts committed outside the course and scope of their state employment. Accordingly, a state employee sued in other than the capacity as an employee is not, as a matter of law, immune from all liability. Martin v. Drylie, 560 So.2d 1285 (Fla. 1st DCA 1990); Knauf v. McBride, 564 So.2d 251 (Fla. 1st DCA 1990). The question for determination is whether at the time of the negligent act alleged, a state-employed physician was acting in the scope of his employment or function pursuant to the terms of section 768.28(9)(a), Florida Statutes. Martin v. Drylie, 560 So.2d at 1288.
The question of scope of state employment presents a jury issue when it arises upon disputed facts. Shands Teaching Hospital & Clinics, Inc. v. Pendley, 577 So.2d 632 (Fla. 1st DCA), rev. denied, 587 So.2d 1329 (Fla. 1991); Testa v. Pfaff, 464 So.2d 220 (Fla. 1st DCA 1985); see also Saudi Arabian Airlines Corp. v. Dunn, 438 So.2d 116, 121 (Fla. 1st DCA 1983) ("whether an employee's tortious acts are within the scope of his employment relationship is normally to be determined by the jury, except in those cases in which a jury could reach only one conclusion that could be sustained").
*657 In the present case, it is clear that although Dr. Holifield did make referrals to other medical specialists, he never referred Roosevelt to another cardiologist after the initial examination revealed a potential heart condition. Dr. Holifield's decision to order and read the echocardiograms at TMRMC, considered in light of the matters raised by Mrs. Gardner's experts, leads, in our view, to competing inferences that may not properly be resolved in favor of the party moving for summary judgment. See Moore v. Morris, 475 So.2d 666 (Fla. 1985) (The court must resolve not only factual conflict, but every possible inference, in favor of the party against whom summary judgment is sought). A permissible inference from the lack of a referral is the one Mrs. Gardner has drawn, i.e., Dr. Holifield assumed responsibility for Roosevelt's condition as a private cardiologist.
We also find that the inconsistent allegations sworn to by Dr. Richard Flamer in his two affidavits create issues of material fact. Generally, the question of inconsistent successive affidavits or deposition testimony has arisen in cases where a party seeking to avoid summary judgment has changed, altered, or explained an earlier statement made under oath. These cases espouse the general rule that a party may not, after having given a deposition or an affidavit in a case, subsequently change his testimony without adequate explanation in order to create an issue when the opposing party moves for a summary judgment. Cary v. Keene Corp., 472 So.2d 851 (Fla. 1st DCA), pet. for rev. denied, 480 So.2d 1294 (Fla. 1985); Home Loan Co. Inc. of Boston v. Sloane Co. of Sarasota, 240 So.2d 526 (Fla. 2d DCA 1970); Maryland Casualty Co. v. Murphy, 342 So.2d 1051 (Fla. 3d DCA), cert. denied, 352 So.2d 173 (Fla. 1977). No reason exists not to apply a corollary of this rule where the party who is seeking summary judgment relies upon the changed testimony of one of its witnesses. The question is not whether Dr. Flamer would be able to give an adequate explanation to a jury for the change in his two affidavits. The question is whether the trial court could properly have overlooked these inconsistencies at the summary judgment stage. In Florida, evidence of inconsistency in testimony and documentary evidence itself creates a disputed issue of fact for the jury, which may not be resolved by the trial court adversely to the nonmoving party. See Roach v. CSX Transp. Inc., 598 So.2d 246 (Fla. 1st DCA 1992).
Mr. Horton, the FAMU trainer, also gave inconsistent testimony. Again, the question of whether he was more accurate when he stated that athletic physicals were not performed as "an official thing" for the university, or when he later explained that Dr. Holifield did not act as a private cardiologist in performing such examinations, is a question to be determined by the jury in this case.
The expert affidavits submitted by Mrs. Gardner create further issues of fact. This is not to say, of course, that every opinion offered by Mrs. Gardner's experts will ultimately be admissible at trial. At this stage, however, the affidavits, on their face, are within the permissible range of expert testimony in that they offer aid in understanding the evidence concerning the scope of services provided by the FAMU Health Center and the adequacy of Dr. Holifield's cardiologic care for Roosevelt Gardner. See § 90.702, Fla. Stat. (1991); Burns v. Florida Department of Transportation, State Paving Corp., 559 So.2d 728 (Fla. 4th DCA 1990) (Expert who reviewed contracts, depositions and project files testified to scope of subcontractor's work under contract).
In light of the foregoing, it is obviously not necessary for us to reach the issue of whether the trial court improperly granted summary judgment while discovery requests and motions to compel were pending. On remand, however, the parties should attempt to resolve any matters concerning discovery with the trial court providing controlling guidance regarding any disputes.
REVERSED and REMANDED.
ALLEN and LAWRENCE, JJ., concur.
NOTES
[1] The general policy statement of the manual says, "The Student Health Service is organized for treating minor illnesses and injuries which commonly occur while the student is in residence at the University." Dr. Flamer, in his deposition, defined minor illnesses as such things as scrapes, bruises, colds, and stress from final exams.
[2] In her deposition, Mrs. Gardner recounted a call from a FAMU nurse. The nurse told Mrs. Gardner not to worry because Roosevelt was seeing a heart specialist and had been to the hospital for tests.
[3] "No officer, employee, or agent of the state or of any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of his employment or function ..."